IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY DEMPSEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14 CV 812 |
| v. ) | Hon. Marvin E. Aspen |
| ) | |
| RICHARD NATHAN, RTC INDUSTRIES ) | |
| INC., CITY OF ROLLING MEADOWS, and ) | |
| DETECTIVE ANTHONY PELUSO, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us are two motions for summary judgment filed by Defendants, seeking dismissal of Plaintiff Gregory Dempsey's ("Plaintiff") claims against them. Dempsey alleges[1] a claim for false arrest under 42 U.S.C. § 1983 against Defendant Anthony Peluso of the Rolling Meadows Police Department ("Detective Peluso"), state law claims of false arrest and malicious prosecution against Defendant Richard Nathan ("Nathan") and RTC Industries, Inc. ("RTC") (collectively "Nathan Defendants"), and state law breach of contract and unjust enrichment claims against RTC. Plaintiff also seeks indemnification from the City of Rolling Meadows ("the City") for damages arising out of Detective Peluso's actions. Defendant Peluso seeks summary judgment on the false arrest claim remaining against him and the City seeks summary judgment on Plaintiff's indemnification claim related to Detective Peluso's conduct.

---

[1] Dempsey filed an eleven-count complaint alleging various state and federal law claims against Defendants. (*See* Compl. (Dkt. No. 1–1).) On September 30, 2014, we granted the Nathan Defendants' motion to dismiss all federal claims against them. (*See* Order (Dkt. No. 41) at 21.) We also granted Defendant Rolling Meadows' motion to dismiss a federal false arrest claim brought against it. (*Id*.) Now, only one federal claim remains; a false arrest claim against Detective Peluso under § 1983.

(*See* Peluso Mem. ISO MSJ (Dkt. No. 99) at 1.) The Nathan Defendants ask us to grant summary judgment on Plaintiff's malicious prosecution and false arrest claims against them and to dismiss and remand Plaintiff's state law contract claims back to state court. (*See* Nathan Mem. ISO MSJ (Dkt. No. 95) at 15.) For the reasons set forth below, we grant Defendants Peluso and Rolling Meadows' motion and deny the Nathan Defendants' motion in part and grant it in part.

## FACTUAL BACKGROUND[2]

Starting in 2008, Plaintiff began development of a "Soccer Goal Securement Device" ("the Device") to prevent soccer goals from turning over and injuring nearby soccer players. (Nathan SOF ¶ 1.) Plaintiff was developing the Device through Goal Alert, LLC, ("Goal Alert"), a small company owned by Plaintiff's brother and another individual. (Resp. Peluso SOF ¶ 7.) In 2011, Plaintiff contacted Defendant Nathan, CEO of RTC Industries, Inc., an international business that develops products for brand and retail stores, to discuss the possibility of a partnership between Goal Alert and RTC. (Nathan SOF ¶ 3.) While RTC and Goal Alert were in partnership discussions, Plaintiff began working for RTC[3] as an independent contractor focused exclusively on the Device. (*Id*. ¶ 7.) Partnership negotiations between Goal Alert and RTC continued through January 30, 2012 but eventually broke down. (Peluso SOF ¶¶ 8–9.) Due to the breakdown in partnership talks, from January 13 through January 30, Plaintiff began

---

[2] Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits. To the extent that either party objected to certain statements of fact or exhibits, we shall rely on admissible evidence only for the purposes of our analysis. *See e.g., Hemsworth v. Quotesmith.Com., Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial."). We decline to address objections specifically unless warranted.

[3] Plaintiff alleges that he was never hired by RTC. (Resp. Peluso SOF ¶ 13.) Plaintiff admits that he signed RTC's "freelancer agreement," but denies conveying any rights to improvements to the Device pursuant to that agreement. (Resp. Nathan SOF ¶ 7.)

to remove from RTC "whatever was there" related to the Device. (Nathan SOF ¶ 12.) In addition to various prototypes and physical components related to the Device (including a part called a "flag stem axle"), Plaintiff removed his original signed freelancer agreement from a filing cabinet in RTC's human resources office. (*Id*. ¶ 13; Peluso SOF ¶ 13.) Plaintiff removed the freelancer agreement from RTC after hours on January 17, 2012. (Nathan SOF ¶ 13.) Earlier that day, Plaintiff requested, and was provided, a copy of his freelancer agreement. (*Id*.) Plaintiff alleges that despite having a copy of the agreement, he took the original from RTC because he was concerned that RTC might alter it. (*Id*. ¶ 14.)

On January 30, 2012, Plaintiff met with Nathan and explained that Goal Alert could not accept RTC's most recent partnership offer and that he would be leaving RTC that day. (*Id.* ¶ 12.) After the meeting, Plaintiff returned to his desk, packed up his belongings, and left the premises with several boxes of component parts and prototypes. (*Id*. ¶ 13.) Plaintiff alleges that during the January 30 meeting, Defendant Nathan told Plaintiff that he could take everything related to the Device for free and to "do great things with it." (*Id*. ¶ 16; Resp. Nathan SOF ¶ 16.) Nathan denies telling Plaintiff to "take everything." (Nathan SOF ¶ 17.)

After Plaintiff left RTC on January 30, Nathan discovered that the original freelancer agreement was missing. (*Id*. ¶ 27.) Nathan attempted to contact Plaintiff concerning the missing property. (*Id*.) Nathan left phone messages with Plaintiff and sent him emails requesting that Plaintiff return Nathan's calls. (*Id*.) When Plaintiff did not return Nathan's calls, Nathan contacted the Rolling Meadows Police Department and filed a theft complaint regarding the missing freelancer agreement. (*Id*. ¶ 25.) Detective Peluso was assigned to investigate Nathan's complaint. (*Id*. ¶ 27.)

Detective Peluso began his investigation into the alleged theft on February 6, 2012. (Peluso SOF ¶ 16.) Detective Peluso met with Nathan and a second RTC employee, Jean Carlson ("Carlson") to discuss the complaint against Plaintiff. (*Id*.) During this meeting, Nathan and Carlson provided Detective Peluso with a copy of surveillance footage from the night the freelancer agreement was removed along with key card access history that established that Plaintiff's keycard was used to enter the area where the agreement was kept. (*Id*. ¶ 18.) Peluso also interviewed Melissa Nolan ("Nolan"), the human resources employee who provided Plaintiff a copy of the freelance agreement in January. (*Id*. ¶ 23.) Nolan informed Detective Peluso that she copied the freelancer agreement for Plaintiff and then returned the original to the filing cabinet. (*Id*. ¶ 23.)

Later that month, RTC contacted Peluso and informed the Detective that materials related to the Device were missing from RTC. (*Id*. ¶ 21.) Nathan and RTC provided Peluso with invoices and purchase orders establishing that the missing materials were in fact ordered and paid for by RTC. (*Id*.) In total, RTC alleged that $6,632 in products were missing. (*Id*. ¶ 22.) The men also provided Detective Peluso with emails establishing that the allegedly missing parts were billed or sent to RTC. (*Id*. ¶ 28.) On February 23, 2012, Detective Peluso spoke with RTC's Chief Financial Officer, Len Bloom ("Bloom"). (*Id*. ¶ 25.) Bloom told Detective Peluso that the parts and prototype of the Device were no longer in Plaintiff's cubicle. (*Id*. ¶ 30.) Four days later, Detective Peluso visited Plaintiff's last known address to speak with Plaintiff and to locate the missing property. (*Id*. ¶ 32.) When Peluso arrived at the residence, he learned that the Plaintiff no longer owned the property, but was given permission to enter by an individual making repairs on the home. (*Id*.) Detective Peluso entered the garage attached to the residence and located numerous cardboard boxes containing metal parts and other devices such as colored

flags with the words "danger" and "safe to play" printed on them. (*Id*. ¶ 34.) Detective Peluso also noticed that some parts had "Goal Alert" inscribed on them and that the cardboard boxes had shipping labels with Plaintiff's name and the name "Goal Alert." (*Id*. ¶¶ 34, 36.) Detective Peluso did not remove any of the contents of the boxes at this time. (*Id*. ¶ 35.) After locating the boxes, Detective Peluso contacted the representative of the new property owner who then gave Detective Peluso permission to remove the boxes he believed might be the stolen RTC property. (*Id*. ¶ 39.) Peluso contacted Nathan and informed him that he may have located the stolen property but was unable to confirm whether the items were in fact related to the Device. (*Id.* ¶ 40.) Detective Peluso asked Nathan to send a RTC representative to the property who could identify the missing materials. (*Id*.) Detective Peluso also requested that RTC bring a van to transport the materials back to RTC. (*Id.*) RTC sent two employees to the residence to retrieve the property. (*Id*. ¶ 41.) Once they arrived, Detective Peluso asked the men to verify if any of the items in the garage matched the missing RTC property. (*Id*.) Michael Fuchs ("Fuchs"), one of the men sent by RTC and an individual who worked with Plaintiff on the development of the Device, inspected the boxes in the garage and informed Detective Peluso that he could not definitively confirm that the property in the garage belonged to RTC. (*Id*. ¶ 43.) The property in the garage was then loaded into the RTC van and was transported back to RTC so RTC could continue to search for the missing materials. (*Id*. ¶ 45.) Detective Peluso requested that Nathan secure the property at RTC. (*Id*. ¶ 47.) Detective Peluso did not contact Plaintiff or a representative from Goal Alert at this time. (Dempsey Decl. (Dkt. No. 114–1) ¶ 19.)

On March 5, 2012, Bloom contacted Detective Peluso and informed him that two flag stem axles ordered and paid for by RTC were discovered in the boxes from Plaintiff's garage.[4] (Peluso SOF ¶¶ 48–49.) Detective Peluso then met with Bloom to discuss these allegations. (*Id.* ¶ 49.) During the meeting, Bloom informed the Detective that each axle was valued at $200. (*Id.*) Bloom provided Detective Peluso with a third flag stem axle to compare to the two axles allegedly found in the cardboard boxes, a purchase order from parts manufacturer Sterling Springs, emails relating to the flag axles, and a computer generated image of the Device that included a component part that resembled the flag axles. (*Id.* ¶¶ 50, 52, 53.) Detective Peluso photographed the axles and asked Bloom to secure the property. (*Id.* ¶ 51.)

On March 6, 2012, Detective Peluso contacted Plaintiff and requested a meeting to discuss his investigation. (*Id.* ¶ 57.) Plaintiff initially agreed to meet with Detective Peluso but after consulting with his attorney, called Detective Peluso back and canceled. (*Id.*) During this second call, Plaintiff informed Detective Peluso that if he was going to be arrested, he would prefer to voluntarily appear. (*Id.* ¶ 58.) Detective Peluso and Plaintiff arranged a time for Plaintiff to report to the Rolling Meadows Police Department the next morning. (*Id.*)

The next day, on March 7, 2012, prior to Plaintiff's arrival at the police department, Detective Peluso contacted and interviewed an employee from Sterling Springs, Eric Dickinson ("Dickinson"). (*Id.* ¶ 55.) Dickinson confirmed that he was involved with processing the flag

---

[4] Plaintiff denies that the flag stem axles were found in the garage and argues that Defendants Nathan and RTC planted the axles in boxes after the items were removed from the garage. (Resp. Peluso SOF ¶ 50; Dempsey Decl. ¶ 18.) Defendants submit a photograph of the flag stem axles in the garage taken by Detective Peluso at Plaintiff's former residence during the initial search. (Peluso SOF ¶ 54; Exhibit C-80 (Dkt. No. 100-4).) Plaintiff argues that the image has been manipulated and he has retained an expert to testify that the image was altered. (Dempsey Decl. ¶ 18.) Plaintiff admits that he removed flag axles from RTC. (Nathan SOF ¶ 13.) There is nothing in the record to suggest that Plaintiff ever articulated to Detective Peluso before his arrest that he believed RTC had planted the flags in the boxes.

axle order for RTC and that he worked directly with Plaintiff regarding the parts. (*Id.* ¶ 55.) Dickinson informed Detective Peluso that the flag axles were custom-made; only five flag stem axles were manufactured in total. (*Id*. ¶ 56.) Dickinson also confirmed that RTC paid for the axles. (*Id.*) Finally, Detective Peluso forwarded Dickinson the photograph of the flag stem axles allegedly recovered from Plaintiff's garage; Dickson informed Detective Peluso that the object in the photograph was in fact a flag stem axle manufactured for RTC by Sterling Springs. (*Id*.)

Plaintiff did voluntarily appear on March 7. (*Id*. ¶ 60.) Upon arrival at the police station, Plaintiff was escorted to booking where he was processed and charged with one misdemeanor count of theft relating to the two flag stem axles.[5] (*Id.*) Detective Peluso signed the criminal complaint on behalf of Nathan and with Nathan's consent. (*Id*. ¶¶ 61–62.) Plaintiff was then formally charged and released on bond. (*Id*. ¶ 60.) The next day, Plaintiff telephoned Detective Peluso, however, Detective Peluso declined to speak with Plaintiff because Plaintiff was represented by counsel. (*Id*. ¶ 65.)

The State's Attorney's Office charged Plaintiff with one count of misdemeanor theft. (*See* Trial Transcript at 7.) Plaintiff was found not guilty in a bench trial on October 10, 2012. (*Id*.) The trial judge concluded that the State did not present sufficient evidence to tie Plaintiff to the flag stem axles; the chain of custody was broken when Detective Peluso instructed RTC to remove the property from the garage and to secure it at RTC. (*Id*. at 54.)

Following his acquittal, Plaintiff contacted various news outlets and informed them of his arrest and subsequent acquittal. (Dempsey Dep. (Dkt. No. 100–5) at 29.) Plaintiff alleges that

---

[5] Plaintiff was formally charged with having "knowingly obtained unauthorized control of property of RTC, being two stainless steel flag stem axles having a total value not exceeding $500 intending to deprive RTC permanently of the use of the property." (*See* Trial Transcript (Dkt. No. 97–12) at 7.) Plaintiff was not charged with theft related to the freelancer agreement. (Nathan SOF ¶ 29.)

his preexisting insomnia and anxiety intensified after his arrest, prosecution and acquittal. (Resp. Nathan SOF ¶ 39.) Plaintiff also alleges that as a result of his arrest and prosecution, he is no longer qualified to serve as the face of "Goal Alert" and has forfeited a $200,000 salary and a membership interest in the company. (Pl. SOF ¶ 17.)

A suit between Nathan Defendants and Plaintiff is currently pending in state court. (Nathan SOF ¶ 42.) In that suit, Plaintiff brings the same breach of contract claim alleged in this federal action. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 244, 106 S. Ct. at 2513. We do not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009)

(citing *Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (citation omitted).

## ANALYSIS

Plaintiff sues individual Defendant Peluso under federal law and Defendants Nathan and RTC under state law. We first consider Plaintiff's federal claims against Detective Peluso and then analyze the claims brought against Defendants Nathan and RTC.

### I. Claims Against Detective Peluso

Plaintiff sues Defendant Peluso in his individual capacity for what he alleges was an unconstitutional arrest under 42 U.S.C. § 1983. Plaintiff argues that Detective Peluso did not have probable cause to arrest him and is not entitled to qualified immunity. (Resp. Peluso MSJ (Dkt. No. 113) at 2–4.) We disagree and grant Detective Peluso's motion.

#### a. Probable Cause to Arrest

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the defendant deprived the plaintiff of a constitutional right, and (2) the defendant acted under color of state law. *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (citing *Reed v. City of Chi.*, 77 F.3d 1049, 1051 (7th Cir. 1996)). Plaintiff sues Detective Peluso in his individual capacity. An individual capacity claim requires only "a showing of personal involvement in the alleged constitutional deprivation by the government actor." *Aleman v. Dart*, No. 08 CV 6322, 2010 WL 502755, at *7 (N.D. Ill. Feb. 9, 2010) (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). A false arrest claim requires proof that an arrest was made without probable cause. *Brooks v. City of Chi.*, 564 F.3d 830, 832 (7th Cir. 2009) (citing *Askew v. City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006)). Therefore, if Detective Peluso had probable cause for the

arrest, Plaintiff's false arrest claim fails. *See Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (explaining that probable cause is an absolute defense to a false arrest claim); *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713–14 (7th Cir. 2013); *Aksoy v. Moreno*, No. 11 C 5798, 2014 WL 949902, at *4 (N.D Ill. March 7, 2014).

Probable cause exists "if at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012) (quoting *Gonzalez*, 578 F.3d at 537). "Police are entitled to base an arrest on a citizen complaint . . . without investigating the truthfulness of the complaint, unless . . . they have reason to believe it's fishy." *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000) (internal citations omitted); *see also Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) (dismissing false arrest claim based on citizen's inaccurate theft complaint; "[s]o long as an officer reasonably believes the putative victim or eyewitness to a crime is telling the truth, he may rely on the information provided to him by such persons in deciding to make an arrest, without having to conduct an independent investigation into their accounts"); *Abbott*, 705 F.3d at 716 (affirming district court's finding of probable cause even though officer did "almost no independent investigation" after a "reasonably credible witness" informed the officer that the suspect committed a crime); *Harney v. City of Chi.*, 702 F.3d 916, 923 (7th Cir. 2012) (finding that a "history of tension" between the complainant and a suspect does not require defendant officer to discredit the citizen's complaint); *McBridge v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) ("Normally, an officer may base a determination of probable cause on information from the putative victim if the officer reasonably believes that the victim is telling the truth.") (internal

citations omitted); *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (holding that complaint of a victim establishes probable cause unless "complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate"); *Bledsoe v. City of Chi.*, No. 99 C 6793, 2000 WL 220494, at *3 (N.D. Ill. Feb. 18, 2000) (finding that a citizen's complaint establishes probable cause for an arrest). Additionally, officers need not investigate all possibilities; "the question is whether they have reasonable grounds on which to act, not whether it was reasonable to conduct a further investigation." *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1024 (N.D. Ill. 2003) (internal citations omitted); *see also Williamson*, 714 F.3d at 447 (upholding dismissal of false arrest claims; defendant police officer's failure to look further into plaintiff's role in the alleged crime "even though it might have led the deputies to not seek an arrest warrant for [plaintiff]–does not suggest that that they knew probable cause was lacking"); *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 624 (7th Cir. 2010) ("While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation."); *Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006) (holding that officers have no duty to investigate extenuating circumstances or to search for exculpatory evidence once they have probable cause to arrest); *Askew*, 440 F. 3d at 896 (finding that "police often encounter competing and inconsistent stories" and the "Constitution permits them to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges and juries in the criminal prosecution"). An officer's subjective state of mind or motive in making an arrest is irrelevant in a probable cause analysis. *Abbott*, 705 F.3d at 718; *Schertz v. Waupaca Cty.*, 875 F.2d 578, 582 (7th Cir. 1989) (dismissing false arrest claim based on alleged intentionally flawed police investigation; regardless of defendants'

actual motive in arresting plaintiff, defendants had probable cause to arrest); *Aksoy*, 2014 WL 949902, at *4–5 (dismissing false arrest claim based on probable cause despite plaintiff's allegation that officer failed to conduct a proper investigation when he did not interview plaintiff and disregarded physical evidence). We consider only the facts known to the officer at the time of the arrest. *Henry v. City of Chi.*, 702 F.3d 916, 922 (7th Cir. 2012).

Plaintiff argues that Defendant Peluso did not have probable cause to arrest and "turned a blind eye to the full context of circumstances." (Resp. Peluso MSJ at 3.) Plaintiff further alleges that Defendant Peluso should have investigated further prior to his arrest. (*Id.*) Plaintiff's arguments misstate the requirements of a constitutionally valid arrest. Detective Peluso began his investigation based on a complaint filed by the Nathan Defendants. (Peluso SOF ¶ 15.). That citizen's complaint alone supports a finding of probable cause.[6] *Abbott*, 705 F.3d at 716; *Williamson*, 714 F.3d at 441; *Harney*, 702 F.3d at 923; *McBridge*, 576 F.3d at 707; *Beauchamp*, 320 F.3d at 743; *Bledsoe*, 2000 WL 220494, at *3. However, we need not rely only on the citizen's complaint to support a finding of probable cause; Detective Peluso supplemented the citizen's complaint with a month-long investigation. Upon receiving the second complaint concerning the flag stem axles, Detective Peluso interviewed Nathan and other RTC employees, attempted to contact Plaintiff, reviewed emails and receipts related to the missing property, and interviewed third-party individuals concerning the flag stem axles. (Peluso SOF ¶¶ 16, 18, 21, 23, 25, 32, 48, 55, 57.) Based on the record, it is clear that at the time of the arrest, Defendant Peluso had reason to believe that the flag stem axles belonged to RTC

---

[6] We find no evidence in the record to suggest that Detective Peluso had reason to believe RTC's complaint was "fishy." *Guzell*, 223 F.3d at 520. The fact that Detective Peluso was aware of a "recent breakdown in business relations," (Resp. Peluso MSJ at 2), is not enough on its own to call the complaint into question. *Harney*, 702 F.3d at 923.

and were illegally removed by Plaintiff.[78]  Plaintiff's argument that Defendant Peluso should have investigated further does not save his false arrest claim.  After Detective Peluso had probable cause for an arrest, he had no constitutional obligation to continue the investigation.  *Williamson*, 714 F.3d at 441; *Stokes*, 599 F.3d at 624; *Mustafa*, 442 F.3d at 548; *Askew*, 440 F. 3d at 896; *Carroccia*, 249 F. Supp. 2d at 1025.  Additionally, at the time of Plaintiff's arrest, Detective Peluso had no reason to believe that Plaintiff had permission to remove the flag stem axles from RTC.[9]  Based on the facts available to Detective Peluso at the time of the arrest, we find that Detective Peluso had probable cause to arrest.  Accordingly, we grant Defendant Peluso's motion for summary judgment.[10]  Because we find that Defendant Peluso is

---

[7] "We look to the requirements of state law in order to determine whether there was probable cause." *Gray v. Burke*, 466 F. Supp. 2d 991, 996 (N.D. Ill. Oct. 31, 2006) (citing *Pourghoraishi v. Flying J, Inc*., 449 F.3d 751, 761 (7th Cir. 2006)).  Under Illinois law, a person commits misdemeanor theft when he, "knowingly obtain[s] unauthorized control of property of [another], . . . having a total value not exceeding $500 intending to deprive [another] permanently of the use of the property." (*See* Trial Transcript (Dkt. No. 97–12) at 7.) Accordingly, to establish probable cause for this arrest, a prudent officer need only reasonably believe that Plaintiff "knowingly obtained unauthorized control of property . . . having a total value not exceeding $500 intending to deprive . . . permanently."  (*Id*.); *Gray*, 466 F. Supp. 2d at 996.

[8] Plaintiff argues that because many of the boxes from the garage were addressed to "Goal Alert;" not RTC, "there was no reason to believe any of the boxes contained stolen property." (Resp. Peluso MSJ at 3).  We disagree.  Employees from RTC informed Peluso that the material from the boxes belonged to RTC, Detective Peluso was provided receipts and other records suggesting that RTC, not Plaintiff, paid for the flag stem axles, and Eric Dickinson, a non-party witness, informed Detective Peluso that the flag stem axles were purchased by RTC.

[9] Since his arrest, Plaintiff has testified that Nathan told him to take materials related to the Device with him. (Dempsey Decl. ¶ 9.)  Additionally, Plaintiff has testified that he told a co-worker that his final meeting with Nathan was cordial and that Nathan gave Plaintiff materials related to the Device. (*Id*. ¶¶ 10–11.)  It is undisputed that Plaintiff never informed Detective Peluso that he was granted permission to take the Device by Nathan. (Peluso SOF ¶ 66).  Accordingly, we do not consider Plaintiff's justification for removing the property from RTC when determining whether Detective Peluso had probable cause to arrest. *Henry*, 702 F.3d at 922.

[10] Because we find that Defendant Peluso had probable cause to arrest and is not liable, we need not consider Defendant's qualified immunity defense.  However, we do note that under the doctrine of qualified-immunity, "a defendant is entitled to qualified immunity in a false-arrest

not liable, we also grant Defendant Rolling Meadows' motion for summary judgment on the indemnification claims. *See* 745 Ill. Comp. Stat. 10/2–109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."); *Fleming*, 674 F.3d at 881.

## II. Remaining State Law Claims Against Nathan Defendants

Based on our decision above granting Defendant Peluso's motion for summary judgment, only state law claims remain. Plaintiff asserts state law false arrest and malicious prosecution claims against the Nathan Defendants and state law breach of contract claims against Defendant RTC. The Nathan Defendants seek dismissal of the state law false arrest and malicious prosecutions claims brought against them. (Nathan Mem. ISO MSJ at 15.) In addition, Defendants Nathan and RTC ask that we dismiss without prejudice and remand back to state court Plaintiff's breach of contract claims.[11] (*Id*.) Plaintiff does not object to remanding the state contract claims. (Resp. Nathan at 12.)

The Seventh Circuit has recognized the "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). We find that dismissal

---

case when, if there is no probable cause, 'a reasonable officer could have mistakenly believed that probable cause existed.'" *Fleming v. Livingston Cty., Ill.*, 674 F.3d 874, 880 (7th Cir. 2012) (internal citations omitted). Accordingly, "as long as [defendant] reasonably, albeit mistakenly, believed that probable cause existed," he is entitled to qualified immunity. *Id*. Plaintiff alleges that Detective Peluso is not entitled to qualified immunity because he conducted an unreasonable investigation. (*See* Resp. Peluso at 4.) This argument is flawed. Evidence of a flawed investigation does not negate a finding of probable cause so long as the information available to the officer at the time of the arrest objectively establishes a likelihood that plaintiff committed a crime. S*chertz*, 875 F.2d at 582; *Aksoy*, 2014 WL 949902, at *4–5.

[11] Additionally, a contract action between the Nathan Defendants and Plaintiff is currently pending in state court. (Nathan SOF ¶ 42.)

is sensible here and dismiss all remaining supplemental state law claims without prejudice.[12]

*Howlett v. Hack*, 794 F.3d 721, 728–29 (7th Cir. 2015) (resolving all of plaintiff's federal claims and dismissing plaintiff's state law malicious prosecution and false arrest claims without prejudice); *Williams Elec. Games, Inc.*, 479 F.3d at 907; *Sweiss v. Ramadani*, No. 15 C 8150, 2016 WL 1383233, at *5 (N.D. Ill. April 7, 2016).

### CONCLUSION

For the reasons stated above, we grant Defendants Peluso and Rolling Meadows' motion for summary judgment and dismiss all claims against Defendants Peluso and Rolling Meadows with prejudice. We dismiss all remaining state law claims against Defendants Nathan and RTC without prejudice. This case is terminated and remanded to the Circuit Court of Cook County. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: June 7, 2016
Chicago, Illinois

---

[12] According to Section 1367(c):
 (c) The district courts may decline to exercise supplemental jurisdiction . . . if–
    (1) the clam raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original jurisdiction, or
    (4) in exceptional circumstances there are other compelling reasons for declining jurisdiction.
28 U.S.C. § 1367(c). Additionally, "subsection (c)(3) expressly authorizes the district judge to dismiss a supplemental claim when the federal claims have dropped out of the case, without his having to consider the criteria in subsections (1), (2), or (4)." *Williams Elec. Games, Inc.*, 479 F.3d at 907. A district court should retain jurisdiction over state law supplemental claims: where the statute of limitations would bar the refiling of the supplemental claims in state court; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided. *Wright v. Assoc. Ins., Co. Inc.*, 29 F.3d 1244, 1251–52 (7th Cir. 1994). None of these factors support retaining jurisdiction over Plaintiff's state law claims here.